*Execution Version*

**ASSET PURCHASE AGREEMENT**

by and among

**FMP VENTURES, INC.**,
as Seller,

**RESERVE INDUSTRIES CORPORATION**,
and
**NATHANIEL POLLOCK**
as Selling Stockholders,

and

**ROLL EM UP FRANCHISE GROUP, LLC**,
as Buyer

Dated as of December 12, 2023

EXHIBIT "A"

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "Agreement"), dated as of December 12, 2023 (the "Effective Date"), is entered into by and among Roll Em Up Franchise Group, LLC, a California limited liability company formerly known as Roll Em Up Franchise Group, Inc. ("Buyer"), FMP Ventures, Inc., a Nevada corporation ("Seller"), Reserve Industries Corporation, a New Mexico corporation ("RI"), and Nathaniel Pollock, an individual ("Pollock", and together with RI, "Selling Stockholders").  Each of the parties named above may be referred to herein as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, Seller is engaged in operating a Roll Em Up Taquitos franchised business at a retail outlet location in Las Vegas, Nevada (the "Business");

WHEREAS, the Selling Stockholders owns all of the issued and outstanding stock of Seller;

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets and liabilities of Seller subject to the terms and conditions set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"Accounts Receivable" has the meaning set forth in Section 2.01(a).

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 2.06.

"Ancillary Documents" means the Bill of Sale, the Assignment and Assumption Agreement, the Seller Note, the Stockholder Note, and the other agreements, instruments and documents required to be delivered at the Closing or in connection with this Agreement.

"Annual Financial Statements" has the meaning set forth in Section 4.03.

"Assigned Contracts" has the meaning set forth in Section 2.01(c).

2

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.02(a).

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Balance Sheet" has the meaning set forth in Section 4.03.

"Balance Sheet Date" has the meaning set forth in Section 4.03.

"Bill of Sale" has the meaning set forth in Section 3.02(a).

"Books and Records" has the meaning set forth in Section 2.01(h).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Albuquerque, New Mexico are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Dollars" or "$" means the lawful currency of the United States.

"Effective Date" has the meaning ser forth in the preamble.

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Financial Statements" has the meaning set forth in Section 4.03.

"Franchise Agreement" means that certain Area Development Agreement, dated as of November 8, 2021, by and between Buyer and Seller.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any

3

self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Interim Financial Statements" has the meaning set forth in Section 4.03.

"Inventory" has the meaning set forth in Section 2.01(b).

"Knowledge of Seller, Seller's Knowledge or Knowledge of Seller" or any other similar knowledge qualification, means the actual or constructive knowledge of Pollock, after due inquiry.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Liabilities" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"Lease Assignment" has the meaning set forth in Section 3.02(a).

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, financial condition (financial or otherwise) or assets of the Business, taken as a whole, or (b) the ability of the Seller Parties to consummate the transactions contemplated hereby on a timely basis.

"Ordinary course of business" or "ordinary course of business consistent with past practice" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent past practices.

"Organizational Documents" means (a) in the case of a corporation, its charter and by-laws; (b) in the case of a limited or general partnership, its partnership certificate, certificate of formation or similar organizational document, its partnership agreement and the Organizational Documents of any general partner; (c) in the case of a limited liability company, its articles of organization, certificate of formation or similar organizational documents and its operating agreement, limited liability company agreement, membership agreement or other similar agreement; (d) in the case of a trust, its certificate of trust, certificate of formation or similar organizational document and its trust agreement or other similar agreement; and (e) in the case of any other entity, the organizational and governing documents of such entity.

"Party" or "Parties" has the meaning set forth in the preamble.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Pollock" has the meaning set forth in the preamble.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Purchase Price" has the meaning set forth in Section 2.05.

"Purchased Assets" has the meaning set forth in Section 2.01.

"Real Property" means the real property leased or subleased by Seller in connection with the Business, together with all buildings, structures and facilities located thereon.

"Representative" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"RI" has the meaning set forth in the preamble.

"Seller" has the meaning set forth in the preamble.

"Seller Note" has the meaning set forth in Section 2.05(a).

"Seller Parties" means, collectively, Seller and Selling Stockholders.

"Selling Stockholders" has the meaning set forth in the preamble.

"Stockholder Note" means that certain Amended and Restated Loan Agreement, dated as of the Effective Date, executed by Buyer in favor of RI for a principal amount of $595,000.00.

"Tangible Personal Property" has the meaning set forth in Section 2.01(d).

"Taxes" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, unclaimed property, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

ARTICLE II
PURCHASE AND SALE

2.01    Purchase and Sale of Assets. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances (other than the Assumed Liabilities), all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), whether now existing or hereafter acquired

5

(other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "Purchased Assets"), including the following:

(a)    all accounts receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("Accounts Receivable");

(b)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("Inventory");

(c)    all Contracts, including those set forth on Section 2.01(c) of the Disclosure Schedules (the "Assigned Contracts");

(d)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "Tangible Personal Property");

(e)    all Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets;

(f)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes;

(g)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(h)    originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, and marketing and promotional surveys, material and research (collectively, "Books and Records");

(i)    all goodwill and the going concern value of the Business; and

(j)    those items listed on Section 2.01 of the Disclosure Schedules.

2.02    Excluded Assets. Notwithstanding the foregoing, the Purchased Assets shall not include the assets, properties, and rights specifically set forth on Section 2.02 of the Disclosure Schedules. (collectively, the "Excluded Assets"):

2.03    Assumed Liabilities.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all Liabilities of Seller arising out of or relating to the Business or the Purchased Assets on or after the Closing, other than the Excluded Liabilities (collectively, the "Assumed Liabilities"), including the following:

(a)    the Stockholder Note;

6

(b)    all trade accounts payable of Seller to third parties in connection with the Business that are not yet due as of the Closing Date;

(c)    all Liabilities arising under or relating to the Assigned Contracts;

(d)    all Liabilities for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period (or any portion thereof) beginning after the Closing Date and (B) Taxes for which Buyer is liable pursuant to Section 6.04; and

(e)    all other Liabilities arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing.

2.04    Excluded Liabilities.  Buyer shall not assume and shall not be responsible to pay, perform or discharge any of the following Liabilities of Seller or any of its Affiliates (collectively, the "Excluded Liabilities"):

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for (i) Taxes of Seller or relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period (or any portion thereof) ending on or prior to the Closing Date, and (ii) any other Taxes of Seller (other than Taxes allocated to Buyer under Section 6.04) for any taxable period;

(c)    any Liabilities relating to or arising out of the Excluded Assets;

(d)    any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or use of the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date; and

(e)    any Liabilities under any Contracts, to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing.

2.05    Purchase Price.  The aggregate consideration to be paid by Buyer to Seller at the Closing shall consist of the following (collectively, the "Purchase Price"):

(a)    $205,000.00 in the form of a secured promissory note in favor of Seller in substantially the form attached hereto as Exhibit A (the "Seller Note"); *plus*

(b)    the assumption of the Assumed Liabilities, including the Stockholder Note in the amount of $595,000.00.

7

2.06    Allocation of Purchase Price. Seller and Buyer agree that the Purchase Price shall be allocated among the Purchased Assets (other than the Contributed Goodwill) for all purposes (including Tax and financial accounting) as shown on the allocation schedule attached hereto as Exhibit B (the "Allocation Schedule"). The Seller Parties and Buyer shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

2.07    Non-Assignable Assets.

(a)    Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a sale, assignment or transfer of any Purchased Asset if such sale, assignment or transfer: (i) violates applicable Law; or (ii) requires the consent or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement and such consent or waiver has not been obtained prior to the Closing.

(b)    Following the Closing, Seller and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent or waiver, or any release, substitution or amendment required to novate all Liabilities under any and all Assigned Contracts or other Liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Buyer shall be solely responsible for such Liabilities from and after the Closing Date; *provided, however,* that neither Seller nor Buyer shall be required to pay any consideration therefor. Once such consent, waiver, release, substitution or amendment is obtained, Seller shall sell, assign and transfer to Buyer the relevant Purchased Asset to which such consent, waiver, release, substitution or amendment relates for no additional consideration. Applicable sales, transfer and other similar Taxes in connection with such sale, assignment or transfer shall be paid by Buyer in accordance with Section 6.04.

(c)    To the extent that any Purchased Asset or Assumed Liability cannot be transferred to Buyer pursuant to this Section 2.07, Buyer and Seller shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset and/or Assumed Liability to Buyer as of the Closing. Buyer shall, as agent or subcontractor for Seller, pay, perform and discharge fully the liabilities and obligations of Seller thereunder from and after the Closing Date. To the extent permitted under applicable Law, Seller shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, all income, proceeds and other monies received by Seller from and after the Closing Date, to the extent related to such Purchased Asset in connection with the arrangements under this Section 2.07. Seller shall be permitted to set off against such amounts all direct costs associated with the retention and maintenance of such Purchased Assets.

ARTICLE III
CLOSING

3.01    Closing. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely via the electronic exchange of documents and signatures simultaneously with the execution of this Agreement or at such other time or place or in such other manner as Seller Parties and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "Closing Date". All actions

8

taken at the Closing shall be deemed to have been taken on the Closing Date at 12:01 am Albuquerque, New Mexico time.

    3.02    <u>Closing Deliverables</u>.

    (a)    At the Closing, Seller Parties shall deliver to Buyer the following:

    (i)    a counterpart of this Agreement duly executed by each Seller Party;

    (ii)    a bill of sale in form and substance reasonably satisfactory to Buyer (the "<u>Bill of Sale</u>") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

    (iii)    an assignment and assumption agreement in form and substance reasonably satisfactory to Buyer (the "<u>Assignment and Assumption Agreement</u>") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

    (iv)    a lease assignment relating to any leased Real Property in form and substance reasonably satisfactory to Buyer (the "<u>Lease Assignment</u>"), duly executed by Seller;

    (v)    a certificate of a duly authorized officer of Seller certifying (A) the names and signatures of the officers of the Seller authorized to sign this Agreement and the Ancillary Documents delivered by or on behalf of the Seller pursuant to this Agreement, and (B) the resolutions of the directors and (if necessary) the requisite equityholders of the Seller approving this Agreement and the Ancillary Documents delivered by or on behalf of the Seller pursuant to this Agreement; and

    (vi)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

    (b)    At the Closing, Buyer shall deliver to or pay, as applicable, Seller the following:

    (i)    a counterpart of this Agreement duly executed by Buyer;

    (ii)    the Assignment and Assumption Agreement duly executed by Buyer;

    (iii)    a counterpart to the Lease Assignment, duly executed by Buyer;

    (iv)    the Stockholder Note duly executed by Buyer;

    (v)    the Seller Note duly executed by Buyer;

    (vi)    confirmation of the termination of the Franchise Agreement duly executed by Buyer, which termination shall release Seller, Selling Stockholders, and their respective Affiliates from any continuing obligations or liabilities thereunder; and

    (vii)    copies of resolutions adopted by the equityholders and directors of Buyer authorizing and approving the execution and delivery of this Agreement and the Ancillary Agreements to which Buyer is a party and the consummation of the

transactions contemplated hereby and thereby, certified to be true, complete, correct and in full force and effect by the member and managers of Buyer.

3.03   Simultaneous Delivery. The delivery of the documents required to be delivered at the Closing pursuant to this Agreement shall be deemed to occur simultaneously.  No delivery shall be effective until each Party has received or waived receipt of all the documents that this Agreement entitles such Party to receive.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

4.01   Organization and Authority of Seller Parties. Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Nevada and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. The Selling Stockholders own all of the issued and outstanding stock of Seller. The Seller Parties have full power, authority and legal capacity, as applicable, to enter into this Agreement and the Ancillary Documents to which the Seller Parties are a party, to carry out their obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Seller Parties of this Agreement and any Ancillary Document to which the Seller Parties are a party, the performance by the Seller Parties of their obligations hereunder and thereunder, and the consummation by the Seller Parties of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of the Seller Parties, as applicable. This Agreement has been duly executed and delivered by the Seller Parties, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the Ancillary Documents constitute legal, valid and binding obligations of the Seller Parties enforceable against the Seller Parties in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and subject to a court's discretionary authority with respect to the granting of a decree ordering specific performance or other equity remedy.

4.02   No Conflicts; Consents. The execution, delivery and performance by the Seller Parties of this Agreement and the Ancillary Documents to which they are a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller; or (b) except as set forth in Section 4.02 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel (x) any material Contract to which Seller is a party or by which any Purchased Asset is bound or (y) any material Permit affecting the properties or assets of the Business as conducted as of the date hereof.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by Seller in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

4.03   Financial Statements. Complete copies of the unaudited financial statements consisting of the balance sheet of the Business as at December 31, 2022 and the related statements of income and retained earnings, stockholders' equity and cash flow for the year then ended (the "Annual Financial

10

Statements"), and unaudited financial statements consisting of the balance sheet of the Business as at June 30, 2023 and the related statements of income and retained earnings, stockholders' equity and cash flow for the six-month period then ended (the "Interim Financial Statements" and together with the Annual Financial Statements, the "Financial Statements") have been delivered to Buyer. The Financial Statements are based on the books and records of the Business. Seller makes and keeps books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their respective assets. The balance sheet of the Business as of June 30, 2023 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date".

4.04    Undisclosed Liabilities. Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

4.05    Absence of Certain Changes, Events and Conditions. Since the Balance Sheet Date, and other than those matters disclosed in writing to Buyer or arising in the ordinary course of business consistent with past practice, there has not been any change, event, condition or development that is materially adverse to: (a) the business, results of operations, financial condition or assets of the Business, taken as a whole; or (b) the ability of Seller to consummate the transactions contemplated hereby.

4.06    Material Contracts. Except as set forth on Section 4.06 of the Disclosure Schedules, Seller is not in breach of or default under any Assigned Contract, except for such breaches or defaults that would not have a Material Adverse Effect.

4.07    Title to Purchased Assets; Sufficiency of Purchased Assets. Seller has good and valid title to, a legal right of use of, or a valid leasehold interest in, all of the Purchased Assets. All such Purchased Assets (including leasehold interests) are free and clear of Encumbrances (other than the Assumed Liabilities). The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

4.08    Legal Proceedings; Governmental Orders.

(a)    There are no Actions pending or, to Seller's Knowledge, threatened against or by Seller relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities, which if determined adversely to Seller would result in a Material Adverse Effect.

(b)    There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business, which would have a Material Adverse Effect.

4.09    Compliance With Laws; Permits. Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, except where the failure to be in compliance would not have a Material Adverse Effect.

4.10    Taxes. Except as would not have a Material Adverse Effect, all material Tax Returns with respect to the Business required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. All Taxes due and owing by Seller or relating to the Business (whether or not shown on any Tax Return) have been, or will be, timely paid, or will otherwise be the responsibility of Seller.

4.11    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Seller.

4.12    No Other Representations and Warranties. Except for the representations and warranties contained in this ARTICLE IV (including the related portions of the Disclosure Schedules), neither the Seller Parties nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information, documents or material regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives in any form (including any information, documents, material, or any management presentations made in expectation of the transactions contemplated hereby), or as to the future revenue, profitability, or success of the Business, or any representation or warranty arising from statute or otherwise in Law.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are true and correct as of the date hereof.

5.01    Organization and Authority of Buyer. Buyer is a corporation, duly organized, validly existing and in good standing under the Laws of the state of California. Buyer has full entity power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite entity action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

5.02    No Conflicts; Consents. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

5.04    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

5.05     Legal Proceedings. There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.06     Solvency; Sufficiency of Funds. Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all Liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

5.07     Independent Investigation. Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE IV of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in ARTICLE IV of this Agreement (including the related portions of the Disclosure Schedules).

ARTICLE VI
POST-CLOSING COVENANTS

6.01     Confidentiality. From and after the Closing, the Parties shall, and shall cause their Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that a Party can show that such information (a) is generally available to and known by the public through no fault of any Party, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by a Party, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If a Party or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, such Party shall promptly notify the other Party in writing and shall disclose only that portion of such information which such Party is advised by its counsel in writing is legally required to be disclosed, *provided* that such Party shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

6.02     Public Announcements. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

6.03     Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

6.04    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne by Buyer and paid when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

6.05    Further Assurances. Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

ARTICLE VII
MISCELLANEOUS

7.01    Expenses. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

7.02    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of receipt) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 7.02):

|  |  |
|---|---|
| If to a Seller Party: | FMP Ventures, Inc.<br>2141 Henniker Way<br>Las Vegas, Nevada 89134<br>Attn: Nathaniel Pollock<br>E-mail: natepollock@fmpventures.com |
|  | and |
|  | 20 First Plaza Ctr NW, Suite 308<br>Albuquerque, New Mexico 87102<br>Attn: Marisa Floyd<br>E-mail: mlfloyd@swcp.com |
| *with a copy to*: | Baker & Hostetler LLP<br>2850 North Harwood Street, Suite 1100<br>Dallas, Texas 75201<br>Facsimile: 214-210-1201<br>Attn: Todd J. Thorson<br>Email: tthorson@bakerlaw.com<br>Attn: Patrick T. Dean<br>Email: pdean@bakerlaw.com |

14

If to Buyer:                    Roll Em Up Franchise Group, LLC

_____

_____

Attn: Ryan Usrey
E-mail: ryan@rollemup.com


7.03    Interpretation. For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Schedules, Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The Schedules, Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

7.04    Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

7.05    Entire Agreement.  This Agreement and the Ancillary Documents constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

7.06    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign its rights or obligations hereunder without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning Party of any of its obligations hereunder.

7.07    No Third-party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

15

7.08    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

7.09    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Mexico without giving effect to any choice or conflict of law provision or rule (whether of the State of New Mexico or any other jurisdiction).

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE STATE COURTS OR FEDERAL COURTS OF THE UNITED STATES OF AMERICA, IN EACH CASE LOCATED IN ALBUQUERQUE, BERNALILLO COUNTY, NEW MEXICO, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL SUIT, ACTION OR PROCEEDING, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 7.09(c)</u>.

7.10    <u>Specific Performance</u>. The Parties acknowledge and agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

7.11    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Signature page follows.*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER**:

FMP VENTURES, INC.,
a Nevada corporation

By: _____
Name:  Nathaniel Pollock
Title:    President

**SELLING STOCKHOLDERS**:

RESERVE INDUSTRIES CORPORATION,
a New Mexico corporation

By: _____
Name:  Marisa Floyd
Title:    Chief Executive Officer

_____
NATHANIEL POLLOCK

*[Signatures continue on following page.]*

[Signature Pages to Asset Purchase Agreement]

**BUYER**:

ROLL EM UP FRANCHISE GROUP, LLC,
a California limited liability company

By: _____
Name: Ryan Usrey
Title: _____

[Signature Pages to Asset Purchase Agreement]

**EXHIBIT A**

**Form of Seller Note**

[*See attached.*]

[Exhibits to Asset Purchase Agreement]

*Final Form*

THIS PROMISSORY NOTE IS ENTERED INTO PURSUANT TO THAT CERTAIN ASSET PURCHASE AGREEMENT DATED EVEN DATE HEREWITH BY AND AMONG MAKER, HOLDER AND THE OTHER PARTIES THERETO (THE "APA").

**PROMISSORY NOTE**

**_____, 2023**                                                                                   **$205,000.00**

FOR VALUE RECEIVED, the undersigned, **ROLL EM UP FRANCHISE GROUP, LLC**, a California limited liability company formerly known as Roll Em Up Franchise Group, Inc. ("Maker"), hereby promises to pay to FMP Ventures, Inc., a Nevada corporation ("Holder"), the principal amount of **TWO HUNDRED FIVE THOUSAND DOLLARS ($205,000.00)** (the "Principal Balance"), together with interest on the outstanding Principal Balance, on or before January 1, 2029 (the "Maturity Date") in accordance with the provisions of this Promissory Note (this "Note").

1.      Interest.  Interest shall accrue on the unpaid Principal Balance of this Note at an annual rate equal to 7% per year (the "Annual Interest Rate"). Interest on the unpaid Principal Balance evidenced by this Note shall be computed on the basis of a THREE HUNDRED SIXTY (360) day year and shall accrue on the actual number of days elapsed for any whole or partial month in which interest is being calculated.  In computing the number of days during which interest accrues, the day on which funds are initially advanced shall be included regardless of the time of day such advance is made, and the day on which funds are repaid shall be included unless repayment is credited prior to the close of business on the Business Day received as provided herein.

2.      Payment Terms; Prepayment.  Principal and interest under this Note shall be paid as follows:

(a)      The Principal Amount and interest are due and payable in equal monthly installments of **TWO THOUSAND THREE HUNDRED SIX AND 25/100 DOLLARS ($2,306.25)**, beginning January 1, 2024, and thereafter on the first day of each succeeding month through December 1, 2028, and in one final installment on the Maturity Date in the amount of the unpaid principal and accrued, unpaid interest as of the Maturity Date.  Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.  If any payment of principal or interest on this Note shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

(b)      Maker may, at any time and from time to time, without premium or penalty, prepay all or any portion of the unpaid Principal Balance of this Note.

3.      Defaults and Remedies.

(a)      Events of Default.  The occurrence and continuance of any of the following shall constitute an "Event of Default" under this Note:

(i)      Maker shall fail to timely make any payment under this Note; or

(ii)      (A) Maker shall commence an Insolvency Proceeding, (B) Maker shall make a general assignment for the benefit of its creditors, (C) Maker shall admit in writing its inability to pay its debts as they become due, or (D) there shall be commenced against Maker an Insolvency Proceeding that (1) results in the entry of an order for relief by a court of competent jurisdiction or any

such adjudication or appointment or (2) remains undischarged or unstayed for a period of 60 consecutive days.

(b)     Remedies.  If an Event of Default has occurred and is continuing:

(i)     Holder may, upon written notice to Maker, declare all or any portion of the unpaid Note Obligations to be immediately due and payable; and

(ii)     Holder shall be entitled to exercise any other rights which such Holder may have been afforded under any contract or agreement at any time and other rights which such holder may have pursuant to applicable law.

4.     Definitions.

"Bankruptcy Code" means title 11 of the United States Code.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Albuquerque, New Mexico are authorized or required by law to close.

"Insolvency Proceeding" means any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets in connection with a bankruptcy, insolvency, reorganization or relief of debtors.

"Law" or "laws" means, collectively, all international, federal, state, local or foreign law, statute or ordinance, treaty, common law, or any rule, code and administrative or judicial authority, regulation, judgment, order, writ, injunction, decree, arbitration award, agency requirement, license or permit of, or agreement with, any governmental authority.

"Note Obligations" means all indebtedness, liabilities and obligations, of any nature or kind, present or future, at any time owing by Maker to Holder pursuant to this Note.

5.     Setoff.  This Note is subject to certain setoff rights set forth in the APA.

6.     Amendment and Waiver.  Except as otherwise expressly provided herein, the provisions of this Note may be amended or waived and Maker may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if Maker has obtained the prior written consent of Holder.

7.     Assignment.  This Note may be assigned by Holder, at its sole discretion.

8.     Cancellation.  After all principal and other Note Obligations at any time owed on this Note have been indefeasibly paid in full, in cash, or if this Note is, or Holder's rights hereunder are, assigned or otherwise transferred to Maker, this Note shall be automatically canceled and Holder shall promptly surrender this Note to Maker for cancellation, and after such cancellation, this Note shall not be reissued.

2

9.      <u>Replacement</u>.  Upon receipt of evidence reasonably satisfactory to Maker of the loss, theft, destruction or mutilation of this Note and, in the case of any such loss, theft or destruction of this Note, upon receipt of an indemnity reasonably satisfactory to Maker or, in the case of any such mutilation, upon the surrender and cancellation of this Note, Maker shall execute and deliver, in lieu thereof, a new Note of like tenor and dated the date of such lost, stolen, destroyed or mutilated Note.  Any Note in lieu of which any such new Note has been so executed and delivered by Maker shall not be deemed to be an outstanding Note and shall be deemed cancelled.

10.      <u>Place of Payment; Notices</u>.

(a)      Payments under this Note are to be made by Maker in the lawful money of the United States of America in immediately available funds.  Payments shall be delivered to the address or account of Holder set forth in Maker's records or at such other address or account as is specified by prior written notice by Holder to Maker.

(b)      All notices, requests, and demands or other communications provided for herein to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of facsimile notice or email notice, when received, addressed as follows, or to such other address as may be hereafter notified by such addressee:

(i)      If to Holder:

FMP Ventures, Inc.
2141 Henniker Way
Las Vegas, Nevada 89134
Attn: Nathaniel Pollock
E-mail: natepollock@fmpventures.com

and

20 First Plaza Ctr NW, Suite 308
Albuquerque, New Mexico 87102
Attn: Marisa Floyd
E-mail: mlfloyd@swcp.com

(ii)      If to Maker:

Roll Em Up Franchise Group, LLC

_____
_____
Attn:_____
E-mail:_____

11.      <u>Business Days</u>.  If any time period for giving notice or taking action expires, on a day that is not a Business Day, such time period shall automatically be extended to the next Business Day.

12.      <u>Waiver of Presentment, Demand and Dishonor</u>.  Maker hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment and diligence with respect to this Note,

and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under the Bankruptcy Code, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the Note Obligations hereunder and any and all extensions, renewals, and modifications hereof.

13.     Governing Law.    All issues and questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by, and construed in accordance with, the laws of the State of New Mexico, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New Mexico or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New Mexico.

14.     Waiver of Jury Trial.    EACH OF MAKER AND HOLDER, BY ACCEPTING THIS NOTE, AGREES THAT IT HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO JURY TRIAL OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS NOTE OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS IN RESPECT OF THIS NOTE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. EACH OF MAKER AND, BY ACCEPTING THIS NOTE, HOLDER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT HOLDER AND MAKER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS NOTE WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF HOLDER OR MAKER TO THE WAIVER OF SUCH PERSON'S RIGHT TO TRIAL BY JURY.

15.     Cost of Collection.    Maker agrees to pay on demand all reasonable and documented out-of-pocket costs and expenses of Holder in connection with the collection of the Note Obligations or the enforcement of this Note, including, without limitation, attorneys' fees.

16.     No Waiver.    The rights and remedies of Holder expressly set forth in this Note are cumulative and in addition to, and not exclusive of, all other rights and remedies available at law, in equity or otherwise.  No failure or delay on the part of Holder in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver of any Event of Default.  No course of dealing between Maker and Holder or their agents or employees shall be effective to amend, modify or discharge any provision of this Note or to constitute a waiver of any Event of Default.  No notice to or demand upon Maker in any case shall entitle Maker to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Holder to exercise any right or remedy or take any other or further action in any circumstances without notice or demand.

17.     Construction.    The headings of the various sections and subsections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.  Unless the context otherwise requires, words in the singular include the plural and words in the plural include the singular. Maker and Holder have participated jointly in the negotiation and drafting of this Note.  In the event an ambiguity or question of intent or interpretation arises, this Note shall be construed as if drafted jointly by Maker and Holder, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Note.

18.    <u>Counterparts; Integration; Effectiveness</u>. This Note and any amendments, waivers, consents, or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. This Note constitutes the entire contract between the parties with respect to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect thereto. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Note.

19.    <u>Severability</u>. If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note or invalidate or render unenforceable such term or provision in any other jurisdiction.

[*Signature page follows.*]

5

IN WITNESS WHEREOF, Maker has executed and delivered this Note on the date first above written.

**MAKER:**

ROLL EM UP FRANCHISE GROUP, LLC,
a California limited liability company

By: _____

Name: _____

Title: _____

[Signature Page – Promissory Note]

**EXHIBIT B**

**Allocation Schedule**

[*See attached.*]

[Exhibits to Asset Purchase Agreement]