IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RESERVE INDUSTRIES CORPORATION
and FMP VENTURES, INC.,

      Plaintiffs,

v.

ROLL EM UP FRANCHISE GROUP, LLC
and RYAN USREY,

      Defendants.

                                      Civ. No. 24-1074 GBW/JMR

ROLL EM UP FRANCHISE GROUP, LLC
and RYAN USREY,

      Counter-Plaintiffs,

v.

RESERVE INDUSTRIES CORPORATION,
FMP VENTURES, INC., and
NATHANIEL POLLOCK,

      Counter-Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Plaintiffs' Motion to Dismiss

Counterclaim (*doc. 29*) and Defendants' Motion to Compel Arbitration and to Stay

Proceedings (*doc. 31*).  Having reviewed the briefing and relevant law, the Court will

grant both motions in part and deny them in part.[1]

## I.    BACKGROUND

Plaintiffs Reserve Industries Corporation ("Reserve Industries") and FMP

Ventures, Inc. ("FMP") filed suit in this court on October 23, 2024.  *Doc. 1.*  Their

complaint alleges as follows.  On or about November 8, 2021, FMP, Reserve Industries

and Counter-Defendant Nathaniel Pollock contracted with Defendant Roll Em Up

Franchise Group, LLC ("Roll Em Up") to purchase the rights to own and operate a Roll-

Em-Up Taquitos restaurant located at 3585 S. Fort Apache Road, Las Vegas, Nevada

89147.  *Id.* at ¶ 15.  The purchase was made pursuant to an Area Development

Agreement ("ADA") executed by FMP and Roll Em Up.  *Id.*  FMP is a joint venture

between Reserve Industries and Mr. Pollock, created to own and operate a franchise

restaurant.  *Id.* at ¶¶ 6, 14

In 2023, Reserve Industries and Mr. Pollock decided to sell the franchise and

contacted Defendant Ryan Usrey, Roll Em Up's CEO.  *Id.* at ¶ 16–17.  On or about

December 12, 2023, FMP, Reserve Industries and Mr. Pollock sold the franchise back to

Roll Em Up pursuant to the Asset Purchase Agreement ("APA") executed on the same

date.  *Id.* at ¶ 20.  According to the APA's terms, in exchange for the restaurant, Roll Em

---

[1] The Court finds that a hearing is unnecessary to resolve the motions.  Plaintiffs' request for oral
argument (*doc. 35* at 1) is therefore denied.

Up was to provide a $205,000 secured promissory note in favor of FMP and to assume liabilities including a stockholder note in the amount of $595,000. *Id*. at ¶ 22. Assumption of the stockholder note was effectuated by Roll Em Up's contemporaneous execution of the Amended and Restated Loan Agreement ("ARLA"). *Id*. at ¶ 23; *see doc. 1-4*. Monthly installments of $6,693.75 were due beginning January 1, 2024. *Doc. 1* at ¶ 25.

Defendants failed to deliver the promissory note to FMP and made no associated payments. *Id*. at ¶¶ 32–33. Roll Em Up likewise failed to make any payments on the stockholder note. *Id*. at ¶ 26. In accordance with the ARLA's provisions, Reserve Industries sent Roll Em Up and Mr. Usrey a notice of acceleration on August 26, 2024, making the entire stockholder note immediately due and payable. *Id*. at ¶ 28. Defendants did not respond. *Id*. at ¶ 29. Meanwhile, Defendants sold the franchise to a new franchisee. *Id*. at ¶ 18. Plaintiffs assert claims of breach of contract based on the ARLA and the APA or, in the alternative, a claim of unjust enrichment. *Id*. at ¶¶ 38–69.

On April 4, 2025, Defendants filed an answer and counter-complaint. *Doc. 14*. They do not dispute that the APA was signed on December 12, 2023, but allege that Mr. Pollock, individually and on behalf of Reserve Industries and FMP, made false statements and material omissions leading up to its execution. *Id*. at ¶¶ 6, 9. Specifically, they allege Mr. Pollock did not disclose a substantial loan that withdrew funds from the restaurant's accounts; that utilities were not included with the rent; that

rent had gone unpaid for an extended period; that restaurant employees had assaulted a customer and her child; or that employees had been openly using illegal drugs on the premises.[2]  *Id.* at ¶ 9.  He also did not provide financial disclosures required under the APA.  *Id.* at ¶ 8.  Counter-Defendants closed the restaurant on December 17, 2023, but did not provide the required disclosures or attempt to resolve the other issues, and refused to provide the new franchise operator with keys or possession of the premises.  *Id.* at ¶¶ 11–12.  On April 19, 2024, the restaurant caught on fire as a result of Counter-Defendants' non-compliant buildout and has not operated since.  *Id.* at ¶ 13.  Defendants allege they would never have signed the APA, and would immediately have terminated the ADA, but for Cross-Defendants' fraudulent inducement and concealment.  *Id.* at ¶ 68.  They further allege that FMP breached the ADA by failing to open new locations on schedule or to operate the franchise in compliance with Roll Em Up's system standards.  *Id.* at ¶¶ 95–96.  They assert counterclaims of fraudulent inducement, negligent misrepresentation, breach of contract based on the APA and ADA, breach of the implied covenant of good faith and fair dealing based on the APA and ADA, gross negligence, and for declaratory relief.  *Id.* at ¶¶ 71–119

---

[2] Based on Defendants' own allegations, it appears they were not entirely unaware of the employee drug use.  They allege that within four months of the restaurant's opening, Mr. Usrey confronted Mr. Pollock about a rumor that employees were selling cocaine and marijuana through the drive-thru and using drugs in the kitchen.  *Doc. 14* at ¶ 4.  Mr. Pollock "acknowledged the drug sales, claimed that he fired at least one individual who was involved, and promised to stop distributing or using illegal drugs at the Las Vegas Restaurant location."  *Id.*

Defendants now move to compel arbitration of all claims, and Plaintiffs move to dismiss several of the counterclaims against them.  *See docs. 29, 31.*

## II.   LEGAL STANDARD

### A.   Federal Arbitration Act

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et. seq.*, governs the enforcement of arbitration agreements involving commerce.  *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232–33 (2013).  It provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  There is a "presumption of arbitrability" under the FAA, *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986), which reflects "a strong national policy favoring the resolution of commercial disputes through arbitration," *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270–71 (1995)).  Doubts about the arbitrability of a particular dispute "should be resolved in favor of arbitration."  *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).  However, arbitration should be ordered "only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue."  *Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287, 299 (2010).  When a party contests either formation or applicability, the court

must resolve the disagreement.  *Id*. at 299–300.  The court "look[s] to state law principles of contract formation to tell . . . whether an agreement to arbitrate has been reached." *Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997).

In addition to agreeing to arbitrate disputes, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).  The court "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs.*, 475 U.S. at 649).  In other words, when determining who should decide arbitrability, the usual presumption in favor of arbitration is reversed.  *Id*. at 944–45. (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).  But "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract," even if the court believes the argument for arbitration of a particular dispute is "wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

B.    Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir.

2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This standard does not require "detailed factual allegations," but it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When ruling on a 12(b)(6) motion, the court must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington*, 643 F.3d at 723 (quoting *Dias v. City & Cnty. Of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). The court need not accept the truth of any legal conclusions. *Iqbal*, 556 U.S. at 678.

Generally, the court may consider materials outside the complaint "only by converting the motion to dismiss to a motion for summary judgment." *Lincoln v. Maketa*, 880 F.3d 533, 537 n.1 (10th Cir. 2018) (citing *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253 (10th Cir. 2005)). However, the court may properly consider "documents incorporated by reference in the complaint" and "documents referred to in and central to the complaint, when no party disputes its authenticity." *Clinton v. Sec. Ben. Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (quoting *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013)). Because the APA and ADA are attached, respectively, to the complaint and countercomplaint; both documents are central to and referenced in the pleadings; and no party disputes their authenticity, the Court finds they are properly considered on motion to dismiss without conversion to summary judgment.

### III.    MOTION TO COMPEL ARBITRATION

Defendants move to compel arbitration of all claims and counterclaims in this action.  They argue that, pursuant to the ADA's delegation clause, all claims must be referred to an arbitrator to determine whether they fall within the scope of the agreement.  Plaintiffs contend that their claims are brought under the APA, which has no arbitration clause, and therefore the claims are not subject to arbitration.

### A.    Delegation of the Arbitrability Determination

The ADA and the APA contain two apparently conflicting provisions with respect to who decides disputes between the parties, including who decides the gateway issue of arbitrability.  Section 7.2(a) of the ADA, which was executed on November 8, 2021, and covers the contemplated opening and operation of the franchise restaurants, states in relevant part:

> Any Dispute between Franchisor (or its affiliated entities) and Franchisee (or its Principal Equity Owners or affiliated entities) not settled through the procedures described in section 7.1 above, or any determination of the scope or applicability of this agreement to arbitrate, will be resolved through binding arbitration . . . .

*Doc. 14-1* at 11.  "Dispute" is defined in § 7.1(a) as "any dispute, claim or controversy arising out of or relating to this Agreement or any alleged breach hereof, including any claim that this Agreement or any part hereof is invalid, illegal or otherwise voidable or void."  *Id*. at 10.  Section 7.2(c) provides that "[t]he arbitration award will be final and binding on the parties," with no provision for appeal to the courts.  *Id*. at 11.  Section

7.2(f) states: "This arbitration provision is deemed to be self-executing and will remain in full force and effect after expiration or termination of this Agreement." *Id*.

The APA, which was executed on December 12, 2023, and governs the sale of the franchise back to Defendants, states in § 7.09(b):

> ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS[3] OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE STATE COURTS OR FEDERAL COURTS OF THE UNITED STATES OF AMERICA, IN EACH CASE LOCATED IN ALBUQUERQUE, BERNALILLO COUNTY, NEW MEXICO, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.

*Doc. 1-2* at 16. In addition, § 7.05 of the APA contains the following merger clause:

> This Agreement and the Ancillary Documents constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

*Id*. at 15.

Before applying the ADA's delegation clause to refer the question of arbitrability to an arbitrator, the Court must determine whether the ADA was superseded by the

---

[3] "Ancillary Documents" are defined as "the Bill of Sale, the Assignment and Assumption Agreement, the Seller Note, the Stockholder Note, and the other agreements, instruments and documents required to be delivered at the Closing or in connection with this Agreement." *Doc. 1-2* at 2. The specified closing deliverables include "confirmation of the termination of the Franchise Agreement duly executed by Buyer, which termination shall release Seller, Selling Stockholders, and their respective Affiliates from any continuing obligations or liabilities thereunder." *Id*. at 9.

APA. "Where . . . parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024) (emphasis in original). In other words, "a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." *Id*. The parties in *Coinbase* had executed two agreements: the first containing an arbitration clause delegating the arbitrability determination, and the second conferring "sole jurisdiction of any controversies" on the California courts. *Id*. at 146. The Supreme Court held that in light of the "conflict between the delegation clause in the first contract and the forum selection clause in the second," the question whether the parties agreed to arbitrate arbitrability could be answered "only by determining which contract applies." *Id*. at 150. Therefore, the court, and not an arbitrator, had to make the threshold determination.

The same reasoning applies here. The arbitration clause of the ADA conflicts with the forum selection clause of the APA. Under the ADA, all disputes must be arbitrated. *See doc. 14-1* at 11. Under the APA, the state and federal courts of New Mexico have exclusive jurisdiction. *See doc. 1-2* at 16. The facts of this case are analogous—indeed, with respect to the dispute resolution provisions of the two agreements, nearly identical—to the facts of *Coinbase*. Accordingly, this Court plainly cannot find there is "clear and unmistakable evidence" that the parties intended the

arbitrator to decide the issue of arbitrability. *Riley*, 157 F.3d at 780. On the contrary, the parties' intent to delegate is at the very least ambiguous. The Court—and not an arbitrator—must therefore determine which agreement controls and whether the claims are arbitrable.

B.    Arbitrability of Plaintiffs' Claims

There is no dispute that the ADA is a validly executed agreement and contains an arbitration clause. Therefore, the question is whether the APA supersedes the ADA's delegation clause with respect to Plaintiffs' claims, or otherwise controls Plaintiffs' claims. The Court finds that it does.

The Tenth Circuit's reasoning in *Riley* is instructive. In that case the parties' first agreement, the "Manufacturing Agreement," included an arbitration clause.[4] 157 F.3d at 777. The parties' second agreement, the "Settlement Agreement," had no arbitration provision and made "no mention of any other dispute resolution mechanisms," but contained a merger clause stating that the agreement "cancels, terminates and supersedes any and all prior representations and agreements relating to the subject matter thereof." *Id*. at 778. The court found that the first agreement's arbitration clause was not totally superseded by the second agreement's merger clause, but that it *was* superseded with respect to the subject matter of the second agreement:

---

[4] The arbitration clause in the parties' first agreement was very similar to the one in the ADA: it mandated arbitration of "all disputes arising out of or relating to" the agreement. *Riley*, 157 F.3d at 777 n.1.

> Instead of Riley's contention that the Settlement Agreement superseded
> all of the Manufacturing Agreement, we conclude that the merger clause
> in the Settlement Agreement cancels only those provisions of the
> Manufacturing Agreement that related to the specific "subject matter" of
> the Settlement Agreement. Therefore, in order to determine the scope of
> the merger clause . . . we must identify the "subject matter" of the
> Settlement Agreement.

*Id*. at 783. The court defined the "subject matter" of the second agreement by reference

to the substantive provisions of the document. *Id*. at 783–85. Only claims that arose

under the first agreement, and did not relate to the subject matter of the second

agreement, were arbitrable. *Id*. at 784.

The same reasoning applies to the present case. The APA contains a similar

merger clause to the *Riley* parties' second agreement and makes no provision for

arbitration. In fact, the case for supersession here is more compelling than in *Riley*

because rather than remaining silent about other dispute resolution mechanisms, *see id*.

at 777, the APA provides an alternate mechanism—litigation of "any" suit, action or

proceeding in the courts of New Mexico, *doc. 1-2* at 16. As in *Riley*, the subject matter of

the APA—selling the franchise from FMP back to Roll Em Up—is related to but distinct

from the subject matter of the ADA, which conferred on FMP the right to open and

operate a franchise. Plaintiffs' claims clearly arise out of the APA and the associated

sale transaction; they do not rely on the terms of the ADA and do not arise from the

opening or operation of the franchise. *See generally doc. 1*. Consequently, the Court

finds that the APA superseded the ADA with respect to the APA's subject matter.

This finding is consistent with state law contract principles governing formation. New Mexico[5] courts have repeatedly refused to extend arbitration clauses beyond the specific subject matter of the parties' agreement. *See Clay v. N.M. Title Loans, Inc.*, 288 P.3d 888, 894 (N.M. Ct. App. 2012) (arbitrable claims "must bear a 'reasonable relationship' to the contract in which the arbitration clause is found") (citation omitted); *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 42 P.3d 1221, 1238 (N.M. Ct. App. 2001) (claims were outside the scope of the parties' arbitration clause because they "do not implicate the rights and obligations set out by the Agreement"). They have explicitly rejected a "but-for" causation standard when determining whether subsequent claims arise under the agreement. *See Clay*, 288 P.3d at 897 ("The mere fact that the dispute would not have arisen but for the existence of the contract . . . is insufficient by itself to transform a dispute into one arising out of or relating to the agreement." (quoting *Aiken v. World Finance Corp. of South Carolina*, 644 S.E. 2d 702, 708 (S.C. 2007))). And, as a general rule of construction, "an integration clause replaces or supersedes prior and contemporaneous contracts concerning the same transaction[.]" *Martinez v. Galles*

_____

[5] The Court applies New Mexico law because the formation and superseding effect of the APA, not the ADA, is principally at issue here. The APA must be construed under New Mexico law. *See doc. 1-2* at 16 ("This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Mexico without giving effect to any choice or conflict of law provision or rule (whether of the State of New Mexico or any other jurisdiction)." The ADA is governed by Nevada law. *See doc. 14-1* at 13 ("The laws of the state where the Development Area is located govern this Agreement, without regard to conflicts of laws."). Even if Nevada law were properly applied here, the parties have provided no authority to suggest that it would compel a different result. Incidentally, the different choice of law provisions—which directly conflict and cannot be reconciled if applied to the same claims—provide further evidence of the parties' intent for the APA to supersede the ADA, at least with respect to subject matter covered by the APA.

*Chevrolet Co.*, 551 P.3d 862, 867 (N.M. Ct. App. 2024) (citing *Nakashima v. State Farm Mut. Auto. Ins. Co.*, 153 P.3d 664, 668 (N.M. Ct. App. 2007)).

In *Doctor's Assocs. v. Carbonell*, 2015 N.M. App. Unpub. LEXIS 252 (N.M. Ct. App. June 29, 2015), the New Mexico Court of Appeals applied these principles to find that a later agreement with a merger clause superseded the prior agreement's arbitration clause. The parties first entered into a franchise agreement with an arbitration clause, then subsequently entered into a stipulated agreement with a merger clause and no dispute resolution provision. *Id*. at *2. Each party brought claims against the other for failure to comply with the stipulated agreement, and the franchisor moved to compel arbitration. *Id*. at *3. The court rejected an argument that "the stipulated award flows from the franchise agreement because the franchise agreement governed the entire relationship of the parties," *id*. at *5–6, and held instead that the issue "centers on whether the [franchisees'] claims are based on the stipulated agreement or the franchise agreement," *id*. at *4. The court likewise rejected an argument by the franchisor, purportedly based on *Riley*, that the merger clause did not "expressly" or "clearly" repudiate the arbitration provision. *Id*. at *13. The court found: "[W]e can reasonably imply from the language of the stipulated award that the parties did not intend for the arbitration provision of the franchise agreement to apply to a breach of the stipulated award." *Id*. at *13. Arbitration was therefore denied. Although *Carbonell* is unpublished, this Court finds its reasoning persuasive regarding New Mexico contract

law.  The facts are closely analogous to the case at hand and the Court finds, for the

same reasons, that the ADA's arbitration clause does not apply to Plaintiffs' claims.

Defendants argue, citing *Riley*, that the APA does not "clearly or expressly

supersede the ADA's arbitration clause."  *Doc. 31* at 8.  They contend that § 7.2(g) of the

ADA, which states that the arbitration provision "will remain in full force and effect

after expiration or termination of this Agreement," *doc. 14-1* at 11, provides for ongoing

arbitrability.  This contention is correct as far as it goes, but nothing prevented § 7.2(g)

from being superseded by a later agreement.  It merely reinforced the usual rule that

"[u]nder the federal common law of arbitrability, an arbitration provision in a contract

is presumed to survive the expiration of that contract unless there is some express or

implied evidence that the parties intend to override this presumption."  *Riley*, 157 F.3d

at 781.  As discussed above, there is evidence here that the parties so intended.

Defendants also argue that § 12 of the proposed Voluntary Mutual Termination

and Release Agreement ("Termination Agreement") expressly incorporates the ADA's

arbitration clause.  *See doc. 31-4* at 3 ("Jurisdiction: The Parties agree that any disputes

relating to the enforcement of this Agreement will be governed by the dispute

resolution provisions set out in the Area Development Agreement.").  There are several

difficulties with this position.  The first is that, as Defendants admit, the Termination

Agreement was never executed because Roll Em Up did not sign it.  *See doc. 31-1* at ¶ 6

("The Termination Agreement was never signed or adopted by [Roll Em Up].").  This

flaw is particularly problematic because the closing deliverable was "confirmation of

the termination of the Franchise Agreement duly executed by Buyer," i.e., Roll Em Up.

Nevertheless, Defendants argue that it was an "Ancillary Document" to the APA and

formed part of the entire, integrated agreement between the parties. *See doc. 1-2* at 15

("This Agreement and the Ancillary Documents constitute the sole and entire

agreement of the Parties with respect to the subject matter contained herein and therein

. . . ."). But even if the unexecuted Termination Agreement is a valid Ancillary

Document under the APA, the APA specifically provides:

> In the event of any inconsistency between the statements in the body of
> this Agreement and those in the Ancillary Documents, the Exhibits and
> Disclosure Schedules (other than an exception expressly set forth as such
> in the Disclosure Schedules), the statements in the body of this Agreement
> will control.

*Id*. The Termination Agreement contains no similar provision. *See generally doc. 31-4.* If

both documents are read together as an integrated whole, the plain language of the

APA resolves the inconsistency between the dispute resolution provisions. *See*

*Martinez*, 551 P.3d at 865 ("Merger or integration clauses providing that the terms of a

contract are intended to govern over prior or contemporaneous contracts, and to

supersede the terms of those contracts in whole or in part, can effectively resolve what

would otherwise be an irreconcilable conflict[.]"). In short, to the extent the

Termination Agreement is an Ancillary Document whose dispute resolution provision

conflicts with the APA, the APA's forum selection clause predominates.

Finally, in their reply brief, Defendants argue that the APA's "permissive forum selection clause," which provides only that actions "may" be brought in New Mexico courts, does not amount to a clear repudiation of the ADA's arbitration clause. *Doc. 40* at 5. But a forum selection clause conferring "exclusive jurisdiction" on certain courts need not be more specific in order to supersede a prior arbitration clause. *See, e.g., Suski v. Coinbase*, 55 F.4th 1227, 1231 (9th Cir. 2022), *aff'd*, 602 U.S. 143 (2024) ("Coinbase is correct that the Official Rules contain no language specifically revoking the parties' arbitration agreement in the User Agreement. By including the forum selection clause, however, the Official Rules evince the parties' intent not to be governed by the User Agreement's arbitration clause when addressing controversies concerning the sweepstakes."). In fact, the second, superseding agreement need not contain a forum selection clause at all. *See Riley*, 157 F.3d at 778 (finding the second agreement revoked the prior right of the parties to demand arbitration although it contained "no mention of any other dispute resolution mechanisms"); *Carbonell*, 2015 N.M. App. Unpub. LEXIS 252, at *11 (rejecting the appellant's argument that the "boilerplate merger clause" of the second agreement was "insufficient to supersede the arbitration clause of the franchise agreement," even though the second agreement did not mention arbitration or contain a forum selection clause). Moreover, even in the absence of a superseding contract, an arbitration clause like the one in the ADA covers only those disputes that arise out of or are reasonably related to the agreement. *See Santa Fe Techs.*, 42 P.3d at 1239 ("We deem

it of utmost importance that the parties' Agreement does not state in an unlimited

manner . . . that any disputes that may arise between the parties in the future shall be

subject to arbitration.  Instead, and more narrowly, it covers only those disputes arising

out of or relating to the Agreement.").

Reading the merger clause, the forum selection clause, and all relevant

documents together, the Court finds that the parties did not intend the ADA's

arbitration clause to apply to claims arising under the APA or related to its subject

matter.  The Court likewise finds that Plaintiffs' claims do not arise under or relate to

the ADA.  The motion to compel arbitration of Plaintiffs' claims is therefore denied.

### C.    Arbitrability of Counterclaims

Defendants move to compel arbitration of "all underlying dispute[s]," *doc. 31* at

2, and "all claims," *id*. at 15.  They argue that the arbitration clause "covers the claims

*and counterclaims* at issue."  *Id*. at 2 (emphasis added).  Defendants' motion must

therefore be construed as a motion to compel arbitration of both Plaintiffs' claims and

Defendants' own counterclaims.

As explained above, the Court agrees with Defendants that the APA did not

wholly supersede the ADA.  The APA states in plain language that it constitutes the

sole and entire agreement of the parties "with respect to the subject matter contained

herein" and that it supersedes all prior and contemporaneous agreements "with respect

to *such subject matter*."  *Doc. 1-2* at 15 (emphasis added).  Consequently, counterclaims

arising from or related to the APA may go forward in litigation, while counterclaims that relate solely to Counter-Defendants' obligations under the ADA must be arbitrated. *See Riley*, 157 F.3d at 784 ("[N]owhere does the [second] Agreement affect the right of the parties to demand arbitration on topics unrelated to the enumerated 'subject matter' of the [second] Agreement.").

Counts One, Two, Three, and Five (respectively for fraudulent inducement, negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing) relate directly to the APA and are therefore non-arbitrable. *See doc. 14* at ¶¶ 71–90, 100–03.  On the other hand, Count Four is a straightforward claim for breach of the ADA, relating solely to obligations under the ADA, and must therefore be arbitrated.  *See id.* at ¶¶ 91–99.

Count Six is styled as a claim for breach of the implied covenant of good faith and fair dealing under the ADA, but contains no factual allegations relating to the ADA. *See id.* at ¶¶ 104–08.  Instead it repeats the factual allegations from Count Five: that Counter-Defendants deliberately concealed facts while negotiating the APA, made no attempt to resolve or disclose the issues at closing, abandoned the restaurant instead of closing the sale properly, and attempted to enforce the stockholder note loan obligation even though its purpose was frustrated by the failed closing of the APA.  *See id.* at ¶ 106.  "To determine the nature of a claim, courts examine the substance of a plaintiff's allegations, not merely the labels applied to them."  *Johnson v. Dep't of Veterans*

*Affs.*, 351 F. App'x 288, 290 (10th Cir. 2009) (citing *Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996)); *see also Benavidez v. United States*, 177 F.3d 927, 931 (10th Cir. 1999) ("To determine the nature of an asserted claim, we focus not on the label the plaintiff uses, but on the conduct upon which he premises his claim as supported by the record."). Because the allegations in Count Six relate to the APA, not the ADA, the Court finds the claim is not within the scope of the arbitration clause.

Count Seven asserts a claim of gross negligence based on faulty work, maintenance and construction that ultimately caused the restaurant to burn down in a fire. *See doc. 14* at ¶¶ 109–115. Specifically, Defendants allege that Counter-Defendants "undertook or oversaw electrical work and other maintenance or construction activities at the Las Vegas Restaurant premises in a careless, negligent, and reckless manner prior to abandoning the location" and "performed faulty electrical installations or repairs that did not meet applicable safety standards and created a serious risk of fire." *Id*. at ¶ 110. This claim does not relate to the APA; therefore, the dispositive question is whether it relates to the ADA. The ADA's principal subject matter is the opening and operation of Roll Em Up Taquitos franchise restaurants, *doc. 14-1* at 5, and it specifically addresses the development obligation to "construct, equip, and open" each restaurant, *id.* at 6.

The Court finds that the maintenance and construction of the restaurant can fairly be said to relate to the subject matter of the ADA. The arbitration clause therefore applies.[6]

Finally, Count Eight is a claim for declaratory relief and seeks the following judgments: (1) that the APA is void, (2) that the stockholder note and promissory note are unenforceable, (3) that the ADA was materially breached and has no further effect, and (4) that no party has a continuing obligation arising out of the "attempted sale" of the Las Vegas restaurant. *Doc. 14* at ¶ 119. To the extent it seeks a declaratory judgment that the ADA was breached, the claim must be arbitrated. The other requests for declaratory relief arise under the APA and may proceed in litigation.[7]

### D.    Requests to Stay and Sever Arbitrable Claims

Having determined that some claims are arbitrable and some are not, the Court must decide how litigation should proceed. Defendants request a stay of the entire case even if only some claims are subject to arbitration. *Doc. 31* at 15. Counter-Defendants, on the other hand, request that if the arbitrable counterclaims are not dismissed, the

---

[6] Plaintiffs contend the ADA relates only to opening "additional restaurants," which they do not interpret as including the restaurant that was actually opened. *See doc. 29* at 10. There is no record evidence of a separate agreement governing the opening of the first restaurant, *see doc. 35* at 10 ("no franchise agreement was ever signed"), and the Court does not construe the ADA so narrowly.

[7] Although Counter-Defendants argue with respect to Plaintiffs' claims that non-signatories Reserve Industries and Mr. Pollock cannot be compelled to arbitrate, *see doc. 35* at 8, they do not make this argument with respect to the counterclaims. On the contrary, they ask this Court to compel arbitration of counterclaims under the ADA. *Id.* at 11. At any rate, given that Mr. Pollock was FMP's President and signed the ADA on its behalf, *see doc. 14-1* at 14, and given that Reserve Industries is almost certainly an "affiliated entity" and/or a "Principal Equity Owner" of FMP, *see id.* at 11, Defendants' argument that Mr. Pollock and Reserve Industries are bound by the ADA's arbitration clause is compelling.

Court should "sever and stay those claims, and then compel them to arbitration." *Doc. 35* at 11.

As a preliminary matter, the Court finds that a stay of the arbitrable claims—rather than dismissal—is appropriate. The Supreme Court has held that where all claims are arbitrable and a party requests a stay pending arbitration, "§ 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Although here only some claims are arbitrable, the Court finds that the same logic applies to support a stay of those claims pending arbitration. The remaining question, therefore, is whether litigation of all claims should be stayed.

The Tenth Circuit has held that "the mere fact that piecemeal litigation results from the combination of arbitrable and nonarbitrable issues is not reason enough to stay [the] entire case." *Riley*, 157 F.3d at 785 (citing *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1517 (10th Cir. 1995)). Rather, the Court should determine

> whether a resolution of [the] arbitrable claims will have a preclusive effect on the nonarbitrable claims that remain subject to litigation. If there will be such a preclusive effect, especially if the arbitrable claims predominate over the nonarbitrable claims, then the district court should consider whether to stay the federal-court litigation of the nonarbitrable claims pending the arbitration outcome on the arbitrable claims.

*Id.* at 785 (citing *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987)); *see also United Comm'ns Hub, Inc. v. Qwest Comm'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002) ("Expanding the stay, so as to encompass all of the nonarbitrable claims in the case, is [only] appropriate where the arbitrable claims predominate, or where the outcome of

the nonarbitrable claims will depend upon the arbitrator's decision." (citation omitted) (alterations in original)); *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.*, 242 F.3d 777, 783 (8th Cir. 2001) ("[I]ssues such as the risk of inconsistent ruling, the extent to which the parties will be bound by the arbitrators' decision, and the prejudice that may result from delays must be weighed in determining whether to grant a discretionary stay, and in fashioning the precise contours of any stay.").

Defendants argue that "whether the APA was ever validly formed depends on whether the APA was induced by fraud—a determination inextricably tied to the misconduct under the ADA." *Doc. 40* at 10. By the same token, they contend, "resolution of the fraudulent inducement claim will necessary involve factual findings regarding Reserve Parties' operational misconduct and concealment thereof." *Id*. Counter-Defendants argue that there is "no common question of law or fact between the claims arising under the APA and the claims arising under the ADA." *Doc. 35* at 12.

It appears from a review of the pleadings that there may be some overlapping factual determinations between the arbitrable claims and the non-arbitrable ones. If this is true, the arbitrator's determination could conceivably have preclusive effect on the litigation. *See MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) ("[A] valid and final award by arbitration generally has the same effect under the rules of res judicata as a judgment of a court." (citing Restatement (Second) of Judgments § 84(1) & cmt. b (1980)); *Romero v. TitleMax of N.M., Inc.*, Civ. No. 17-775 KG/SCY, 2022 U.S. Dist.

LEXIS 46732, at *13 (D.N.M. Mar. 15, 2022) ("New Mexico courts give preclusive effects

to arbitration awards if the 'arbitration affords opportunity for presentation of evidence

and argument substantially similar in form and scope to judicial proceedings.'"

(quoting *Rex, Inc. v. Manufactured Hous. Comm. of State of N.M, Manufactured Hous. Div.,*

892 P.2d 947, 952 (N.M. 1995))).  On the other hand, it appears the overlap is likely not

as significant as Defendants assert.  The ADA and APA are governed by different

substantive law, *see doc. 1-2* at 16, *doc. 14-1* at 13, and findings by the arbitrator seem

unlikely to determine the outcome of any claim in litigation.  For instance, a factual

finding that illegal drug activity was occurring at the restaurant, or that rent and

utilities were unpaid, might bear on but would not dispose of the claims and

counterclaims under the APA, which involve factual questions about concealment and

principles of New Mexico contract formation.

 Based on these complex considerations, the Court finds the issue has been

inadequately briefed.  The parties understandably devoted little argument to the proper

scope of a stay if only some claims were arbitrated, and the Court will give them an

additional opportunity to brief the issue before making its final decision.  For the time

being, therefore, the Court will stay all arbitrable claims and will issue a temporary stay

of the entire case.

 The Court will deny Counter-Defendants' request to sever the arbitrable claims.

Rule 21 governs misjoinder and grants courts the ability to "sever any claim against a

party." Fed. R. Civ. P. 21. Misjoinder "occurs when there is no common question of

law or fact or when . . . the events that give rise to the plaintiff's claims against

defendants do not stem from the same transaction." *Nasious v. City & Cnty. of Denver*,

415 F. App'x 877, 880 (10th Cir. 2011) (quoting *DirecTV, Inc. v. Leto*, 467 F.3d 842, 844 (3d

Cir. 2006)). "It is within the district court's broad discretion whether to sever a claim

under Rule 21." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000). To

determine whether severance is appropriate, courts have considered such factors as

"whether settlement or judicial economy would be promoted, whether prejudice would

be averted by severance, and whether different witnesses and documentary proof are

required for separate claims." *Gonzales v. N.M. Dep't of Health*, Civ. No. 22-525 WJ/SCY,

2024 U.S. Dist. LEXIS 36361, at *5 (D.N.M. Feb. 29, 2024) (citing *Safe Streets All. v.

Alternative Holistic Healing*, 2015 U.S. Dist. LEXIS 91323, at *5 (D. Colo. July 14, 2015)).

The Court finds that the arbitrable counterclaims are not misjoined because they

plainly involve common questions of law and fact to the nonarbitrable claims. For

instance, Defendants allege that the same conduct which breached the ADA was

fraudulently concealed from them while negotiating and executing the APA. The

claims also arise from the same "series of transactions or occurrences," *see* Fed. R. Civ.

P. 20(a)(1)(A). The Court finds no reason to exercise its discretion and sever the claims.

As noted above, the Court has the power to stay only certain claims pending arbitration

if that is warranted. Plaintiffs do not explain how severing the arbitrable claims, rather

than merely staying those claims and proceeding with the remainder in litigation, would promote settlement or judicial economy or avert prejudice. The Court sees no benefit to severance and the request is therefore denied.

## IV.    MOTION TO DISMISS COUNTERCLAIMS

Plaintiffs Reserve Industries and FMP move to dismiss the counterclaims against them for fraudulent inducement, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing under the ADA, and gross negligence. *Doc. 29*.

### A.    Sufficiency of Factual Allegations Against Reserve Industries

Plaintiffs contend that Defendants fail to state a counterclaim against Reserve Industries for fraudulent inducement or negligent misrepresentation because the alleged facts relate only to Mr. Pollock's actions and knowledge. *Id*. at 4–5. They also contend that Defendants have not met the heightened pleading standard for fraud under Rule 9(b).[8] *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1210 (10th Cir. 2025) ("This language requires a complaint alleging fraud to set forth the

---

[8] Plaintiffs did not originally reference Rule 9(b) in their motion. *See doc. 29* at 5–6. However, Defendants raised it in their response, *see doc. 36* at 6–8, and Plaintiffs' related arguments in the reply brief are therefore properly considered. *C.f. In re Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1112 n.5 (10th Cir. 2017) ("[A]rguments raised for the first time in a reply brief are waived.").

time, place and contents of the false representation, the identity of the party making the

false statements and the consequences thereof.") (quotation and citation omitted).

Ordinarily, a federal court looks to the choice-of-law rules of the forum state to

determine which substantive law applies. *Pikk v. Pedersen (In re Zagg Inc. Shareholder*

*Derivative Action)*, 826 F.3d 1222, 1228 (10th Cir. 2016). But where the parties agree a

particular state's law should apply, the Court need not conduct its own analysis. *See id.*

("The parties agree that Nevada law should apply to the futility issue . . . and we see no

reason to search for a reason to disagree."); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d

1175, 1180–81 (10th Cir. 2007) ("The parties agree that the applicable substantive law is

that of Colorado . . . [w]e therefore assume that this case is governed by Colorado

substantive law[.]"). Because both Plaintiffs and Defendants cite cases involving New

Mexico tort law and neither suggest that another state's law may apply, the Court will

assume that New Mexico law applies to the counterclaims unless otherwise specified.

To bring a claim of fraudulent inducement under New Mexico law, the plaintiff

must show: "1) a misrepresentation of fact or failure to disclose a material fact; where 2)

the falsity was known to the maker or where the representation or concealment was

reckless; 3) the maker acted with the intent to deceive and to induce the other party to

act in reliance; and 4) the other party actually relied on the representation or

concealment." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 994

(10th Cir. 1999) (citing *Lotspeich v. Golden Oil Co.*, 961 P.2d 790, 792 (N.M. Ct. App.

1998)).  To claim negligent misrepresentation, the plaintiff must show that: "(1) the defendant made a material representation to plaintiff, (2) the plaintiff relied upon the representation, (3) the defendant knew the representation was false or made it recklessly, and (4) the defendant intended to induce reliance by the plaintiff." *Robey v. Parnell*, 392 P.3d 642, 652 (N.M. Ct. App. 2017) (citation omitted).

The Court finds that the counter-complaint successfully alleges the requisite elements against at least some of the Counter-Defendants.  Defendants allege that Mr. Pollock, "individually and on behalf of Reserve and FMP," made material misrepresentations about the total cost of the restaurant buildout, the quality of construction and its compliance with applicable laws, the operational costs of the business, the liabilities of the business, and employee misconduct involving illegal drugs. *Doc. 14* at ¶ 6.  These alleged misrepresentations included failing to disclose "a significant loan with Toast Capital" and "tens of thousands of dollars owed in unpaid rent and electrical utilities."  *Id*.  Defendants allege that misleading conversations between them and Mr. Pollock took place on May 23, 2023 (concerning operating costs and rent), September 26, 2023 (concerning drug activity), and November 6, 2023 (concerning operating costs, rent, and utilities).  *Id*. at ¶¶ 36, 37, 38.  The contents of Mr. Pollock's statements are quoted.  *Id*.  Defendants allege the statements were knowingly false and made to induce them to repurchase the franchise.  *Id*. at ¶¶ 45–47.  They allege they relied on the false statements and omissions.  *Id*. at ¶¶ 46, 65–69.  They also allege

that "[p]rior to signing the APA, Pollock, FMP, and Reserve did not disclose the Toast loan to [Roll Em Up] or Usrey." *Id*. at ¶ 51.

The question at hand is whether the allegations are sufficient to state a claim against Reserve Industries. Nearly all of the supporting factual allegations rely on an agency theory to establish Reserve Industries' liability. Under New Mexico law, "[a]n agent is one authorized by another to act on his behalf and under his control." *N.M. Military Inst. v. NMMI Alumni Ass'n*, 458 P.3d 434, 440 (N.M. Ct. App. 2018) (quoting *Hansler v. Bass*, 743 P.2d 1031,1036 (N.M. Ct. App. 1987)). "In determining whether an agency relationship exists, the 'principal consideration' is 'the control, or right to control' the agent's conduct." *Id*. (quoting *Shaver v. Bell*, 397 P.2d 723, 727 (N.M. 1964)). The APA shows that Reserve Industries and Mr. Pollock were joint "Selling Stockholders" of FMP, *doc. 1-2* at 1, and Plaintiffs' motion does not dispute that Mr. Pollock acted on behalf of FMP. But none of the facts alleged establish that Mr. Pollock had any authority to act on behalf of Reserve Industries. The conclusory allegation that Mr. Pollock acted "on behalf of Reserve," without more specific factual support, is insufficient to state a claim relying on agency. Likewise, the allegation that Mr. Pollock "participated in a conspiracy with Reserve," doc. 14 at ¶ 20, is wholly conclusory and the Court need not accept its truth. The allegation that "[p]rior to signing the APA, Pollock, FMP, and Reserve did not disclose the Toast loan to [Roll Em Up] or Usrey," *id*. at ¶ 51, does not rely on an agency theory. But it fails to meet Rule 9(b)'s heightened

pleading standard for fraudulent inducement because it does not "set forth the time, place and contents of the false representation." *See Gaddy*, 148 F.4th at 1210.

A closer question is presented by the claim of negligent misrepresentation. Although there is some disagreement among federal courts, this Court finds persuasive the reasoning of *City of Raton v. Ark. River Power Auth.*, 600 F. Supp. 2d 1130, 1142–44 (D.N.M. 2008), that negligent misrepresentation is not subject to Rule 9(b). The counterclaim for negligent misrepresentation is therefore reviewed under the ordinary Rule 8 pleading standard. While the allegations against Reserve Industries border on conclusory, the Court finds there is just enough factual detail to state a claim based on failure to disclose the loan. Under New Mexico law, "[n]egligent misrepresentation can be established by commission or omission." *Cobb v. Gammon*, 389 P.3d 1058, 1070 (N.M. Ct. App. 2016) (citation omitted). A party may be liable for damages caused by a failure to disclose "so long as there exists a duty to disclose." *Id*. (citing *Gouveia v. Citicorp Person-to-Person Fin. Ctr., Inc.*, 686 P.2d 262, 266–67 (N.M. Ct. App. 1984)). Such duty may exist if a party "knows that the other party to a contemplated transaction is acting under a mistaken belief, or if he has superior knowledge not within the reach of the other party." *Woodworker's Supply*, 170 F.3d at 994 (citing *Krupiak v. Payton*, 561 P.2d 1345, 1346 (N.M. 1977)). Defendants allege that Reserve Industries did not disclose the Toast loan prior to signing the APA and that it "deliberately concealed" the information from Roll Em Up and Mr. Usrey, *doc. 14* at ¶ 72. They also allege that Reserve

Industries and the other Counter-Defendants were the "sellers, operators, and insiders to the Las Vegas Restaurant business" and "were in a special position of knowledge such that Cross-Complainants [sic] were entitled to rely on the accuracy of the information given." *Id*. at ¶ 83. These facts, though scant, are more than "labels and conclusions," *see Twombly*, 550 U.S. at 555, and state a claim for negligent misrepresentation under New Mexico law. The motion is therefore granted as to Count One against Reserve Industries, and denied as to Count Two.

        B.    <u>Express Waiver of Claims</u>

Plaintiffs argue that Defendants expressly waived their counterclaims of fraudulent inducement and negligent misrepresentation via § 5.07 of the APA, which states:

> Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, book and records and other documents and data of Seller for such purposes. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express warranties of Seller set forth in ARTICLE IV of this Agreement (included related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in ARTICLE IV of this Agreement (including the related portions of the Disclosure Schedules).

*Doc. 1-2* at 13; *see doc. 29* at 6.

It is well settled that "in New Mexico exculpatory clauses do not preclude liability." *Jones v. Augé*, 344 P.3d 989, 999 (N.M. Ct. App. 2014) (quoting *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 820 P.2d 1323, 1325 (N.M. 1991)). "A party fraudulently induced to enter into a contract 'cannot be precluded from seeking redress by a provision inserted in the contract by the party perpetrating the fraud, designed to shut the mouth of the adverse party as to such fraudulent representations which led up to the making of the contract.'" *Id.* (quoting *Golden Cone*, 820 P.2d at 1325–26). This principle is true for negligent as well as fraudulent misrepresentations. *See Golden Cone*, 820 P.2d at 1325 (holding the exculpatory clause did not bar plaintiff's "misrepresentation claims," which included both fraudulent misrepresentation and negligent representation); *Macgregor v. MiMedx Grp., Inc.*, 2021 U.S. Dist LEXIS 94767, at *16–17 (D.N.M. May 18, 2021) (reviewing case law and determining that this general rule applies to claims of negligent misrepresentation). Plaintiffs cite no authority to support their contrary position. Accordingly, the Court finds no ground for dismissal on the basis of § 5.07.

## C.    Economic Loss Doctrine

Plaintiffs argue the counterclaims of fraudulent inducement, negligent misrepresentation, and gross negligence are barred by the economic loss doctrine, which "prevents plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Doc. 29* at 6–7 (quoting *U.S. ex rel. Custom*

*Grading, Inc. v. Great Am. Ins. Co.*, 952 F. Supp. 2d 1259, 1269 (D.N.M. 2013)).  Because

the Court has already determined that the counterclaim for gross negligence must be

arbitrated, only the counterclaims for fraudulent inducement and negligent

misrepresentation are considered.

    As an initial matter, since New Mexico's adoption of the economic loss doctrine

in 1989, *see Utah Int'l, Inc. v. Caterpillar Tractor Co.*, 775 P.2d 741 (N.M. Ct. App. 1989),

"application of the rule by New Mexico courts has occurred only in the context of strict

products liability cases."  *NM-Emerald, LLC v. Interstate Dev., LLC*, 488 P.3d 707, 711

(N.M. Ct. App. 2021); *see also Gutierrez v. Padilla*, 2023 N.M. App. Unpub. LEXIS 117, at

*15–16 (N.M. Ct. App. Mar. 29, 2023).  The court in *NM-Emerald* noted "multiple

variations and exceptions" in the way that other states apply the doctrine and declined

to decide whether it might be expanded in New Mexico because of the parties'

inadequate briefing.  488 P.3d at 711–12.  To date, the undersigned is aware of no case

law establishing the economic loss doctrine outside of the product liability context, and

Plaintiffs articulate no persuasive argument for extending it.

    Moreover, the claims of fraudulent inducement and negligent misrepresentation

in this case do not "flow[] only from a contract."  *See Custom Grading*, 952 F. Supp. 2d at

1269.  They precede the execution of the APA and rely on tort principles, not on the

terms of the contract.  *See SE Techs., Inc. v. Summit Elec. Supply Co.*, Civ. No. 00-1511

LG/LFG, 2002 U.S. Dist. LEXIS 30083, at *11–12 (D.N.M. Feb. 28, 2002) (finding

economic loss doctrine inapplicable to fraudulent and negligent misrepresentation claims because they arise out of "stated misrepresentations" and "accordingly derive from the law of torts rather than from the law of contracts"). New Mexico's state courts have consistently allowed similar claims to go forward despite the existence of a contract. *See*, *e.g.*, *Golden Cone*, 820 P.2d at 1325–26 (recognizing claims of fraudulent and negligent misrepresentation arising from the defendant's conduct prior to signing the contract). The Court therefore finds the economic loss doctrine does not bar Defendants' counterclaims.

### D. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs move for dismissal of Count Six, titled "Breach of Implied Covenant of Good Faith and Fair Dealing (ADA)." *Doc. 14* at ¶¶ 104–08. As previously discussed, Count Six contains no factual allegations that relate to the ADA. The Court must examine "the substance of [the] allegations, not merely the labels applied to them." *Johnson*, 351 F. App'x at 290 (citing *Weaver*, 98 F.3d at 520). In consequence, the counterclaim is not arbitrable under the ADA but is duplicative of Count Five (breach of the implied covenant under the APA), with which it shares all substantive factual allegations. "Duplicative claims may be dismissed pursuant to Rule 12(b)(6) or may be stricken pursuant to Rule 12(f) as 'redundant, immaterial, impertinent, or scandalous' for the sake of judicial efficiency." *Hallum v. Four Corners Ob-Gyn, Civ*. No. 17-007 MV/SCY, 2019 U.S. Dist. LEXIS 43773, at *17 (D.N.M. Mar. 18, 2019) (citation omitted);

*see, e.g., Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025) (finding duplicative claim was properly dismissed).  The Court finds dismissal is appropriate here.

Counterclaimants argue in their response that their "allegations is [sic] not confined to the specific averments in Counterclaim ¶ 101–103"[9] because "they expressly 'incorporate by reference all prior paragraphs" and "the entirety of the incorporated allegations should be considered in evaluating the sufficiency of [their] claim." *Doc. 36* at 11 n.2.  But the Court is under no obligation to conduct a scavenger hunt for potentially relevant allegations:

> We have approved a district court's similar refusal to "search through the several paragraphs of the plaintiffs' 'Introductory Allegations' and attempt to match the factual assertions with the elements of all subsections of the RICO statute to determine if the complaint states a claim for relief." *Glenn v. First Nat'l Bank in Grand Junction*, 868 F.2d 368, 371 (10th Cir. 1989). Nor are defendants required "to 'piece' together the plaintiffs' complaint." *Id*.

*Hart v. Salois*, 605 F. App'x 694, 701 (10th Cir. 2015) (addressing the plaintiff's failure to connect his separate claims with the complaint's factual allegations).  Counterclaimants are represented by counsel.  The Court will not guess at their legal theories or act as their advocate to determine which particular factual allegations might support a claim under the ADA.  The Court likewise will not accept the facts presented in the response

---

[9] Presumably this is meant to refer to ¶¶ 104–08; Plaintiffs moved only to dismiss Count Six, the claim for breach of implied covenant of good faith and fair dealing "regarding the Area Development Agreement (ADA)." *Doc. 29* at 7.  Paragraphs 100–103 contain the allegations of Count Five.

brief, *see doc. 36* at 11, as if they had been properly pled in Count Six.  The motion is therefore granted as to this claim.

       E.    <u>Claims Under the ADA</u>

Finally, Plaintiffs move for dismissal of any claims against them under the ADA for improper venue pursuant to Fed. R. Civ. P. 12(b)(3).  *Doc. 29* at 9–10.  Plaintiffs' argument on this point is that this Court is the "improper venue" because the claims against them based on the ADA should be arbitrated rather than litigated here.  As described above, the Court finds that several of the counterclaims arise under the ADA and should therefore be stayed pending arbitration.  This ruling resolves Plaintiffs' improper venue argument as they have presented it.

However, the Court will also address a venue issue with respect to this Court's authority to compel arbitration of the counterclaims.  The ADA's arbitration clause states: "All hearings and other proceedings will take place at the JAMS Inland Empire business location in Riverside County, California, or if Franchisor so elects, at another JAMS business location nearest where Franchisee's (or an applicable Principal Equity Owner's) principal place of business is then located."  *Doc. 14-1* at 11.  According to the complaint, FMP has its principal place of business in Las Vegas, Nevada, and Reserve Industries—which is likely a "Principal Equity Owner" under the ADA[10]—has its

---

[10] Section 5.1 of the ADA defines "Principal Equity Owners" as "persons owning more than 20% of Franchisee."  *Doc. 14-1* at 9.  According to the complaint, FMP is a "joint venture" between Reserve Industries and Mr. Pollock, and "all of the issued and outstanding stock of FMP is owned by Reserve and

principal place of business in Albuquerque, New Mexico. *Doc. 1* at ¶¶ 5–6. It therefore seems that arbitration might be proper, at Roll Em Up's election, in either California, Nevada, or New Mexico.

Section 4 of the FAA provides in relevant part that the "hearing and proceedings" under the parties' arbitration agreement "shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. The Tenth Circuit has held that "where the parties agreed to arbitrate in a particular forum only a district court in that forum has authority to compel arbitration under § 4." *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219–20 (10th Cir. 2005). In other words, "a district court lacks authority to compel arbitration in other districts, or in its own district if another has been specified for arbitration." *Id.* at 1220 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 328 (7th Cir. 1995)). Therefore, under *Ansari*, this Court might have lacked authority to compel arbitration if Roll Em Up were to elect arbitration in California or Nevada. However, this rule "is not jurisdictional but 'one of venue which the parties . . . waive[] by not raising the issue before the district court.'" *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1059 (10th Cir. 2018) (quoting *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1051–52 (10th Cir. 2006)). In this case, both parties have waived it.

---

Pollock." *Doc. 1* at ¶ 6. While the Court cannot conclusively determine the percentage of stock held by Reserve Industries, as opposed to Mr. Pollock, it appears likely that Reserve Industries owns more than 20% of FMP.

Defendants clearly waived any objection by asking the Court to compel arbitration. *See doc. 31*; *Cavlovic*, 884 F.3d at 1059 (finding the defendant "disclaimed the forum/venue provisions of its agreement [when it] moved the [District of Kansas] to order arbitration" (quoting *Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1152 (10th Cir. 2014)) (alterations in original)).  Although Plaintiffs request dismissal based on "improper venue," *doc. 29* at 10, they have also asked the Court to sever and stay all claims under the ADA and "compel them to arbitration," *doc. 35* at 11.  They have likewise asked this Court to decide whether the counterclaims are subject to the ADA's arbitration clause. *Doc. 42* at 10.  They have not questioned this Court's authority to compel arbitration, suggested that the claims should be transferred to a different federal district, or referenced the law on venue cited above.  The Court therefore finds that Plaintiffs have also waived any objection based upon the *Ansari* holding regarding authority to compel arbitration, both by asking the Court to compel arbitration of the counterclaims and by failing to make that specific argument in the briefing.  As the issue is waived by both parties, the Court has the authority to compel arbitration and does so herein.

Plaintiffs also argue that punitive damages claims should be dismissed under Section 7.2(e) the ADA, which states: "TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PARTIES WAIVE ALL RIGHTS THEY MAY HAVE TO SEEK PUNITIVE DAMAGES FROM ONE ANOTHER." *Doc. 14-1* at 11; *see doc. 29* at 12.  To the extent

claims arise under the ADA, they are subject to arbitration and the Court has no power to determine the parties' entitlement to punitive damages.  To the extent claims are unrelated to the ADA, the provision simply does not apply.

### V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Dismiss Counterclaim (*doc. 29*) is **GRANTED IN PART** and **DENIED IN PART**.  Defendants' Motion to Compel Arbitration and to Stay Proceedings (*doc. 31*) is **GRANTED IN PART** and **DENIED IN PART**.  It is **ORDERED** as follows:

(1)    Counter-Plaintiffs are **ORDERED** to arbitrate of Counts Four and Seven of the Counter-Complaint, and to arbitrate the portion of Count Eight relating to whether the ADA was breached;

(2)    Count Six of the Counter-Complaint is **DISMISSED WITHOUT PREJUDICE** and Count One is **DISMISSED WITHOUT PREJUDICE** as to Counter-Defendant Reserve Industries Corporation;

(3)    All proceedings in this action are hereby **STAYED**;

(4)    No later than **30 days** from the date of this Order, the parties shall submit supplemental briefing about whether all claims should remain stayed pending arbitration.  The briefing is strictly limited to **ten (10) pages** and arguments unrelated to the stay will not be considered; and

(5)    The parties shall file a joint status report no later than **30 days** from the date of this Order, and every three months thereafter, updating the Court as to the progress of the arbitration proceedings.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**